## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **RAVIN A. MANGAL** ) | |
| **8501 Cameron St.** ) | |
| **Silver Spring, MD 20910** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Civil Action No.** |
| ) | |
| **MEGAN J. BRENNAN** ) | |
| **POSTMASTER GENERAL** ) | |
| **United States Postal Service** ) | **Jury Trial Demanded** |
| ) | |
| ) | |
| **Defendant.** ) | |
| ) | |

## COMPLAINT

Plaintiff, Ravin Mangal, by and through his undersigned counsel, complains of Defendant

United States Postal Service, as follows:

## NATURE OF THE CASE

1.      In 2012, Plaintiff joined the United States Postal Service (USPS) as a Business Evaluation

Analyst in the Washington, D.C. headquarters. In 2013, Plaintiff engaged in statutorily-protected

activity following harassment by several USPS marketing executives based on his race and

national origin.   Thereafter, despite being a stalwart and high achieving employee, who

consistently received outstanding performance evaluations, Defendant removed job duties from

Plaintiff, failed to select him for a promotional position in the Postal Career Executive Service,

denied him a training opportunity, and undermined his work product.

2.      Accordingly, Plaintiff brings this action to recover damages for Defendant's violations of

Title VII of the Civil Rights Act of 1964.  Plaintiff alleges that Defendant subjected him to discriminatory harassment based on his race (Asian-Indian) and in retaliation for his prior protected activities.

## JURISDICTION AND VENUE

3.     This Court has federal question jurisdiction because more than 180 days have passed since Plaintiff filed his formal EEO complaint of discrimination.  Venue is proper because the unlawful employment practices were committed in this judicial district, the relevant employment records are maintained and administered in this judicial district and the Defendant's principal offices are located in this judicial district.

## EXHAUSTION OF REMEDIES

4.     Plaintiff has exhausted all of his administrative remedies.

5.     On or about November 25, 2015, Plaintiff filed a formal complaint of discrimination alleging discriminatory harassment based on his race (Asian-Indian) and in retaliation for his prior EEO activity.

6.     Pursuant to Plaintiff's request, USPS issued a Final Agency Decision (FAD) dated July 12, 2018, and received by Plaintiff's counsel on July 16, 2018.

7.     Accordingly, Plaintiff timely files this action in accordance with the FAD, which provided Plaintiff the right to file this Complaint within 90 days of receipt.

## PARTIES

8.     Plaintiff, Ravin A. Mangal ("Plaintiff" or "Mr. Mangal"), resides at 8501 Cameron St., Silver Spring, Maryland.

9.     At all times relevant to the issues in this complaint, Plaintiff was employed as a Business Evaluation Analyst and then as a Manager of Revenue & Industry Analysis at the

Washington, D.C. Headquarters located 475 L'Enfant Plaza, SW, Washington, D.C. 20260.

10.    On information and belief, Defendant Megan J. Brennan, Postmaster General, is named in her official capacity as Postmaster General of the agency that employed Plaintiff within the U.S. Government.

## FACTUAL ALLEGATIONS

*Background*

11.    On or about January 2012, Mr. Mangal joined the United States Postal Service as a Business Evaluation Analyst.

12.    During his tenure with the Postal Service, Mr. Mangal has been an exemplary employee, receiving excellent employee reviews from his managers. He was recognized as the 2017 Vice President of Finance and Planning Engagement Leader of the Year.  He also completed the Postal Service Managerial Leadership Program in July 2014, which is designed to provide a foundation to further expand managerial skills for employees who have been identified as high performers.

*Ms. Manabe creates a DVD movie box cover depicting Plaintiff as Kumar from the Harold and Kumar movies.*

13.    In or about May 2013, Chief Marketing and Sales Officer, Nagisa Manabe, began referring to Mr. Mangal as "Kumar." On several occasions Ms. Manabe told Mr. Mangal that he reminded her of the character "Kumar"—a dark-skinned Indian-American character in the "Harold and Kumar" movies.

14.    On or about July 25, 2013, Ms. Manabe used postal service resources to create a racist and derogatory DVD movie box cover of "Harold and Kumar Go To White Castle " with Plaintiff's picture replacing the picture of the Indian-American actor in the movie.

15.    Ms. Manabe circulated the DVD movie box cover that she created during the bi-weekly

3

meeting for the Chief Financial Officer and Chief of Marketing and Sales.  Several finance and marketing sales executives were in attendance, including Cliff Rucker, Vice President of Sales, and Katherine "Kathy" Banks, Manager of Revenue Evaluation.

16.     Mr. Mangal was offended and humiliated by the DVD movie box cover and being associated with the "slacker" Indian-American character, Kumar, which undermined his stature in the organization.

17.     However, Mr. Rucker and Ms. Banks thought Ms. Manabe's depiction of Mr. Mangal as "Kumar" was hilarious.

18.     After the meeting, Ms. Banks circulated the video among Mr. Mangal's teammates, while ridiculing him and referring to him as "Kumar."

19.     The next day some of Mr. Mangal's coworkers began calling him "Kumar." This behavior occurred several times a week.

20.     On or about August 25, 2013, Mr. Mangal filed an EEO complaint for discrimination based on his race and national origin (South Asian).  The EEO complaint was resolved in September 2013, through a confidential settlement.

21.     However, Mr. Mangal continued to be referred to as "Kumar."  On or about February 28, 2014, Mr. Mangal heard someone refer to him as "Kumar" at the L'Enfant Plaza food court.  And in August 2015, a co-worker approached him for advice with an EEO case saying that he heard about Ms. Manabe's DVD box cover.

*Ms. Banks becomes Mr. Mangal's supervisor and falsely claims his work is incorrect in retaliation for his prior protected activity.*

22.     On or about April 1, 2014, Defendant assigned Ms. Banks as Mr. Mangal's direct supervisor, despite her prior discriminatory and oppressive treatment towards him. Ms. Banks

immediately began to create a hostile work environment for Mr. Mangal.

23.     On or about May 21, 2014, Ms. Banks tried to embarrass Mr. Mangal during an executive meeting with Gene Sutch, Manager of Finance (Infrastructure) and Shaun Mossman, Vice President of Finance and Planning, by falsely claiming that Mr. Mangal's work was incorrect.  Ms. Banks stated that Mr. Mangal's data was inaccurate, his calculations were wrong, she did not agree with his presentation and that he needed to redo his analysis, despite signing off on his presentation a couple of days prior.

24.     Following the executive meeting, Mr. Mangal asked Ms. Banks why she had humiliated him. Ms. Banks responded, "Ravin you filed an EEO against me; now I am your direct manager and I don't know how to handle the situation."

25.     When Mr. Mangal suggested that they discuss the matter with her supervisor, Mr. Sutch, Ms. Banks said that she wanted to keep the conversation between "just the two of us." However, she agreed to send an email apologizing and stating that Mr. Mangal's work was correct and she was wrong. Later that day, Ms. Banks sent the apology email to Mr. Sutch, Mr. Mossman, and Mr. Mangal.

*Mr. Mangal transfers to a new position in the Finance department.*

26.     Because Ms. Banks said she did not know how to manage him due to his prior EEO complaint, on or about May 27, 2014, Mr. Mangal found a position in the Global Business department.

27.     However, in or about June 2014, prior to transitioning to his new position, Mr. Mossman told Mr. Mangal that he wanted him to stay in the Finance department and removed him from Ms. Banks' supervision.  Mr. Mangal agreed to stay in Finance.

28.     From in or about June 2014 to April 2015, Mr. Mangal was detailed to the Manager of

Revenue and Industry Analysis position. In or about April 2015, Mr. Mangal was officially promoted to the Manager of Revenue and Industry Analysis position.

29.     In his new job, Mr. Mangal worked on DRIVE 30 and analyzed every aspect of USPS's revenue.

30.     DRIVE (Delivering Results, Innovation, Value, and Efficiency) is a management process used by the Postal Service to improve business strategy, development, and execution. DRIVE 30 is an initiative that seeks to provide systematic, accurate, and actionable revenue by products, customers, and the Industry, to enable their senior leadership to make informed business decisions. It is sponsored by the Postmaster General with direct oversight from the Executive Leadership Team (ELT).

*Ms. Manabe wrongfully discredits Mr. Mangal's work in retaliation for his prior protected activity.*

31.     On or about July 22, 2014, Mr. Mangal was tasked with conducting a pricing analysis of the financial impact of a priority mail price change.

32.     From on or about July 22, 2014 to on or about November 12, 2014, Mr. Mangal and his team spent approximately three (3) months working on the package portfolio pricing analysis, working late into the evening, writing complex formulas, meeting and collaborating with other postal service teams, and conducting industry and market research to build the pricing analysis. Upon completion of the analysis, Mr. Mangal was asked by his supervisors to provide a formal memorandum to the Sales and Marketing management team.

33.     Mr. Mangal's pricing analysis showed that USPS competitive products were significantly underpriced.

34.     In November 2014, Ms. Manabe utilized postal funds to hire an outside consulting

firm, Boston Consulting Group (BCG), to conduct a similar pricing analysis in order to
undermine and discredit Mr. Mangal's work.

35.     On or about June 2015, a pricing meeting was held at the William F. Bolger Center in
Potomac, Maryland to fix the damage caused by Ms. Manabe and BCG and implement Mr.
Mangal's pricing recommendations.

36.     Not only did Ms. Manabe retaliate against Mr. Mangal but her actions also placed the
Postal Service at great financial risk.

37.     By the end of October 2015, a new pricing strategy was presented to the Board of
Governors and the Postal Regulatory Commission, which reflected Mr. Mangal's analysis.

38.     On or about January 17, 2016, Mr. Mangal's pricing analysis recommendations were
implemented by the Postal Service.

*Plaintiff's DRIVE 30 job duties are removed and he is denied training in retaliation for his
prior protected activity.*

39.     In or around mid to late 2014, Mr. Mangal was assigned DRIVE 30 Revenue Reporting
(Roadmap 6) and Sales Reporting (Roadmap 7).

40.     As of January 8, 2015, Mr. Mangal's name was listed on DRIVE 30 Roadmaps 6 and 7
showing that these areas were assigned to him.

41.     Beginning in or about January 2015 and continuing through April 2015, Ms. Manabe
and Mr. Rucker objected to Mr. Mangal performing any work related to DRIVE 30, and
verbally stated in meetings that he should not be involved with the process.

42.     On or about June 17, 2015, Mr. Mangal's name was removed from Roadmap 6
(Revenue Reporting). At this time, his name remained on Roadmap 7 (Sales Reporting).

43.     On or about September 4, 2015, Mr. Rucker denied Mr. Mangal training that Mr.

Mangal needed to perform his job duties.

44.     On or about September 4, 2015, Mr. Mangal was asked by his immediate supervisor,

Samie Rehman, Manager-Revenue and Volume Forecasting, at the direction of Joe Corbett,

Chief Financial Officer and Executive Vice President, to request training on the Customer

Data Mart (CDM) program so that Mr. Mangal could assist with the DRIVE 30, Revenue

Reporting, Sales Program analysis, and management briefing.

45.     CDM, a system that restores revenue data, is managed by Mr. Rucker.

46.     After receiving Mr. Mangal's email requesting the training, Carmen Gil, Information

Technology Program Manager, requested via email that a meeting be set up in order to discuss

the items and game plan. Within minutes of receipt of Ms. Gil's email, however, Mr. Rucker

responded refusing to provide training to Mr. Mangal. Ms. Gil called Mr. Mangal and stated

that her hands were tied and that he could not be given training because of the directive from

Mr. Rucker.

47.     On or about September 11, 2015, John White, a contractor, sent Mr. Mangal an email

stating that Mr. Rucker and Richard Sherrill, Mr. Rucker's manager, had directed him not to

provide Mr. Mangal with any reports or data.

48.     On or about September 25, 2015, Mr. Mangal's name was completely removed from

the Drive 30 project.

49.     Manager of Revenue and Field Accounting Doug Gerner, a Caucasian male, with no

known-prior EEO activity, became the Roadmap owner for DRIVE 30.

50.     On or about February 3, 2016, Mr. Germer told Mr. Mangal that he had been directed

to exclude Mr. Mangal from attending a CDM meeting at the Bolger Training Facility. Mr.

Germer claimed that there was not enough room for him to attend, even though approximately

thirty (30) attendees participated in the meeting, including non-Postal Service employees.

*Mr. Mangal is not selected for promotional positions based on his race and in retaliation for his prior protected activity*

51.     At the Postal Service headquarters, the majority of executive positions/vacancies are not posted.  The decision to fill a Director/Executive position is determined by Postal Service executive management.

52.     On or about June 22, 2015, Executive Director of Brand Marketing, Betty Su, asked Mr. Mangal to interview for the Director of Customer Insights position. This position would have been a promotion for Mr. Mangal.

53.     Mr. Mangal was well qualified for the Director of Customer Insights position.  Ms. Su told Mr. Mangal that given his knowledge and work as the Manager of Revenue and Industry Analysis, he had the skills for the job.  Ms. Su also told Mr. Mangal that James Cochran, the new Chief Marketing and Sales Officer, wanted him to fill the role.

54.     Inexplicably, on or about August 6, 2015, Mr. Mangal learned that Dan Barrett (Caucasian/no known prior EEO-activity) had been selected for the position instead.

55.     After Mr. Barrett assumed the Director position, he began to withhold work-related information from Mr. Mangal claiming he needed permission from Mr. Cochran to share work-related information with Mr. Mangal.

56.     Since April 2015, the Manager of Revenue Analysis position (Postal Career Executive Service position) has been vacant.   Mr. Mangal has not been considered for the position, even though he is in the Corporate Succession Planning program for the Manager of Revenue Analysis position.

*Mr. Mangal reports the hostile, discriminatory, and retaliatory work environment, but
Defendant takes no action to remedy the issues.*

57.     On or about September 21, 2015, Mr. Mangal reported the hostile, discriminatory and

retaliatory workplace issues that he was experiencing to his supervisor, Manager of Revenue

and Volume Forecasting, Samie Rehman, verbally during a private meeting that he requested,

and in writing beforehand. In response, Mr. Rehman advised Mr. Mangal that he needed to

discuss the events with his boss, Mr. Mossman, and that he would get back to him. Shortly

thereafter, Mr. Rehman followed up with Mr. Mangal and conveyed that Mr. Mossman stated

that "this is not a big deal," "there is nothing to worry about," and to "brush it off."

58.     On or about September 25, 2015, after being told by Mr. Rehman to "brush it off," Mr.

Mangal verbally reported the same hostile, discriminatory and retaliatory workplace issues that

he was experiencing to Joseph Bruce, Human Resources Manager. Mr. Bruce told Mr. Mangal

he would follow up with him, but he never did.

59.     On or about September 25, 2015, Mr. Mangal also contacted Mr. Mossman about the

workplace issues.  Mr. Mossman said he would set up a meeting but never followed up with

Mr. Mangal.  On or about October 10, 2015, Mr. Mangal emailed Mr. Mossman requesting a

meeting.  Mr. Mossman replied that his administrative assistant would set up a meeting, but no

meeting was scheduled.

60.     On or about October 5, 2015, Mr. Mangal emailed Jeff Williamson, Chief Human

Resources Officer, about the workplace issues.  Mr. Williamson admitted that he previously

had to talk to Mr. Rucker about his behavior.  He also stated that what Ms. Manabe did was

wrong and that she was no longer employed by USPS.

*Injury to Plaintiff*

61.     Because of Defendant's conduct, Mr. Mangal has suffered, and will continue to suffer, irreparable loss and injury, including but not limited to, pain and suffering, physical injury and sickness, economic loss, humiliation, embarrassment, indignity, mental and emotional distress, and the deprivation of his rights to equal employment opportunity.

62.     Through the actions of Defendant's employees, agents, and/or representatives described above, Defendant acted intentionally, maliciously, oppressively, and with willful, callous, wanton, and reckless disregard for Plaintiff's rights.

63.     Because of the experiences Mr. Mangal faced in his workplace, he received counselling from a psychotherapist/psychiatrist monthly for therapy and treatment of PTSD.

64.     Mr. Mangal's cardiologist placed him on a heart monitor due to the anxiety he was experiencing in the work place, which caused him intense chest pain.

65.     On or about October 7, 2015, while wearing his heart monitor at work, Mr. Mangal experienced extreme chest pains and dizziness, which caused him to visit the emergency room. He was later notified that the heart monitor demonstrated periods of tachycardia, also known as rapid heart rate, which occurred only during his work hours.

## COUNT 1

66.     Plaintiff repeats and realleges the allegations set forth in paragraphs 1-65.

67.     By and through its conduct, Defendant subjected Plaintiff to unlawful discrimination and a hostile work environment based on his race in violation of Title VII of the Civil Rights Act of 1964.

## COUNT 2

68.     Plaintiff repeats and realleges the allegations set forth in paragraphs 1-67.

69.     By and through its conduct, Defendant subjected Plaintiff to unlawful discrimination and a

hostile work environment in reprisal for filing an EEO complaint in violation of Title VII of the

Civil Rights Act of 1964.

## JURY DEMAND

Plaintiff demands a trial by jury on each count in this Complaint.

WHEREFORE, Plaintiff demands judgment against Defendant on Counts 1 and 2, and

seeks a promotion to a Director position, and damages consisting of back pay and benefits; medical

expenses; compensatory damages to be determined by a jury for pain and suffering, mental

anguish, emotional distress, embarrassment, humiliation and indignity; punitive damages; plus an

amount equal to the tax on any award, costs and attorneys' fees; and any such other relief as the

Court deems just and proper.

Date:       October 12, 2018               Alan Lescht & Associates, P.C.

                                           _/s/_____
                                           Susan L. Kruger, DC Bar # 414566
                                           1825 K Street, N.W., Suite 750
                                           Washington, DC  20006
                                           202-463-6036
                                           202-463-6067 (fax)
                                           *Attorneys for Plaintiff*